UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF MONTANA

| | |
|---|---|
| In re<br><br>**JAMES LEE HAYES**, and<br>**JENNIFER LYNN HAYES**,<br><br>Debtors. | Case No. **07-60316-13** |
| **JAMES LEE HAYES** and **JENNIFER LYNN HAYES**,<br><br>Plaintiffs.<br><br>-vs-<br><br>**WATER SKI MANIA ESTATES HOMEOWNERS ASSOCIATION**, **BRIAN HEENEY**, **LINDA HEENEY**, **EDWARD SIMMONS**, **LINDA SIMMONS**, **FRANK CREASIA**, **DORY CREASIA**, **KEVIN SYVRUD**, **AMY SYVRUD**, **ROBERT JARDON**, and **NANCY JARDON**,<br><br>Defendants. | Adv No. **07-00045** |

*MEMORANDUM of DECISION*

At Butte in said District this 3rd day of October, 2007.

In this Adversary Proceeding, after due notice, trial was held September 7, 2007, in Butte. The Debtor/Plaintiffs were represented at the trial by attorney Gregory W. Duncan of Helena, Montana and the Defendants were represented at the trial by attorney Daniel R. Sweeney of Butte, Montana. Don Parsons, Tom Hanson, debtor Jim Hayes, and Bill Bahny testified and

1

Exhibits A, B, C, H, J, M and O along with Exhibits 1, 2 and 5 (consisting of 5-1, 5-2, 5-3, 5-5 and 5-5) were admitted into evidence without objection. Exhibits 3, 4 and 7 were admitted into evidence despite objection.

Prior to the trial, the parties filed a Final Pretrial Order. In the Final Pretrial Order, the parties agreed to the following facts:

1. James Hayes and Jennifer Hayes are owners of Lot #8 and 12, as shown on Amended Certificate of Survey filed under document number 460212/E records of Lewis and Clark County, Montana, Excepting Therefrom, that property depicted on Certificate of Survey Document number 477972/E, records of Lewis and Clark County, Montana.

2. Brian Heeney and Linda Heeney are owners of Lot 5 of WATER SKI MANIA ESTATES MINOR SUBDIVISION located in E1/2W1/2SW1/4 of SECTION 4, TOWNSHIP 10 NORTH, RANGE 3 WEST, as shown on Plat filed under Document Number 477972/E, records of Lewis and Clark County, Montana.

3. Frank Creasia and Dori Creasia are owners of Lot 2 of WATER SKI MANIA ESTATES MINOR SUBDIVISION located in E1/2W1/2SW1/4 of SECTION 4, TOWNSHIP 10 NORTH, RANGE 3 WEST, as shown on Plat filed under Document Number 477972/E, records of Lewis and Clark County, Montana.

4. Kevin Syrvud and Amy Syrvud are owners of Lot 3 of WATER SKI MANIA ESTATES MINOR SUBDIVISION located in E1/2W1/2SW1/4 of SECTION 4, TOWNSHIP 10 NORTH, RANGE 3 WEST, as shown on Plat filed under Document Number 477972/E, records of Lewis and Clark County, Montana.

5. Edwin Simmons and Linda Simmons are owners of Lot 4 of WATER SKI MANIA

ESTATES MINOR SUBDIVISION located in E1/2W1/2SW1/4 of SECTION 4, TOWNSHIP 10 NORTH, RANGE 3 WEST, as shown on Plat filed under Document Number 477972/E, records of Lewis and Clark County, Montana.

6.  Robert Jardon and Nancy Jardon [are owners of] Lot 1 of WATER SKI MANIA ESTATES MINOR SUBDIVISION located in E1/2W1/2SW1/4 of SECTION 4, TOWNSHIP 10 NORTH, RANGE 3 WEST, as shown on Plat filed under Document Number 477972/E, records of Lewis and Clark County, Montana.

7.  The predecessors in interest to the Debtors were Tom and Sue Hanson. The Hansons purchased certain real property in Lewis and Clark County, Montana, consisting of four parcels. Two of the four parcels were described as Lots 8 and 12 as shown on Amended Certificate of Survey filed under Document Number 460212/E, records of Lewis and Clark County.  The Hansons developed this real property by building a water ski lake, Serenity Lake, on the property and established a minor subdivision consisting of five lots described as the Water Ski Mania Estates Minor subdivision, all of which are located on the east side of the water ski lake.  These five lots are now the lots that are owned by the separate Defendants.

8.  At the time the Water Ski Mania Estates Minor Subdivision was established, Tom and Sue Hanson promulgated a set of Restrictive Covenants for the purpose of governing the property in the subdivision.

9.  Tom and Sue Hanson built a home for themselves on the southern end of the water ski lake.

10.  Tom and Sue Hanson subsequently sold to the Debtors in July, 2004 their interest in Lots 8 and 12, excepting therefrom Lots 1, 2, 3, 4 and 5 of the Water Ski Mania Estates Minor Subdivision.

11. The Plaintiffs, James and Jennifer Hayes are the debtors in the above captioned bankruptcy proceeding.

12. Tom and Sue Hanson originally purchased 80 acres, including Lots 8 and 12, as described on COS 460212E, records of Lewis and Clark County.

13. On the west 40 acres they built "No Wake Lake" which is not involved here.

14. On the east shore of Serenity Lake, Water Ski Mania Estates was established and is referred to as Lots 1 - 5.

15. Lots 1 - 5 are covered by Covenants referred to as Water Ski Mania Estates Restrictive Covenants.

16. Lots 8 and 12 are not described in the Covenants. The Covenants describe the property covered by the Covenants as being the "E½ W½ SW¼ Section 4, Township 10 North, Range 3W, the area of the tract excluding all roads is 11.3 acres." This describes lots 1 - 5.

17. The Covenants were originally placed upon the property and instituted, on or about October 25, 1991.

18. Section VI (g) provided the Homeowners with a right of first refusal to purchase the lake property.

19. The owners of lots 1-5 herein after "HOA" do not pay dues for their use of the lake.

In addition to the foregoing, the evidence and testimony at trial established, not inconsistent with the agreed facts, that Tom and Sue Hanson built a water ski lake, known as Serenity Lake, on a portion of Lots 8 and 12 and established a minor subdivision consisting of 5 lots described as Water Ski Mania Estates, a Minor Subdivision ("WSME"). The five lots that comprise WSME are all located on the east side of Serenity Lake. In conjunction with the development of WSME, Tom drafted restrictive covenants that were duly recorded in 1991. The

Restrictive Covenants define a "landowner" as "the record owner . . . of a fee simple title to any lot which is part of the property." The term "property" is defined in the Restrictive Covenants as "County of Lewis and Clark. E½ W½ SW¼ Section 4, Township 10 N, Range 3 W. The area of the tract excluding all roads is 11.3 acres." The Restrictive Covenants also provide that "[a] maximum of six (6) landowners shall be allowed the use of the lake. Five (5) landowners shall be owners of lots in WATER SKI MANIA ESTATES and one landowner shall be the owner of a single family dwelling built on property immediately west of the lake." Finally, the Restrictive Covenants differentiate between landowners and the lakeowner by defining the lakeowner as "the owner of the body of water immediately adjoining the lots in the subdivision."

The Hansons, in conjunction with building Serenity Lake and WSME, also developed a business on their property that included a ski school, and the sale of boats and other water ski equipment. The Hansons also held clinics and water ski tournaments on Serenity Lake. From the testimony, it appears that the Hansons' business operations on Serenity Lake were done through an entity referred to as Water Ski Mania. Thus, Water Ski Mania and WSME are two separate and distinct entities.

The Hansons originally owned the entire 40 acres consisting of Lots 8 and 12 and also owned the adjoining 40 acres immediately due west of Lots 8 and 12. Hansons built a second lake, No Wake Lake, on the western 40 acres and sold such property. No Wake Lake and Serenity Lake run parallel to each other and are separated by a thin strip of land. A purchaser of at least a portion of the western 40 acres built a home on the southeastern end of No Wake Lake.

The Hansons initially lived on Lot 1 of WSME and sold Lots 2 through 5. However, in 1996, the Hansons decided to sell their home on Lot 1 and build a new home. The current owners of Lots 1 through 5 are the Defendants in this Proceeding.

When the Hansons began contemplating building a new home, they felt that instead of building their home on the western edge of Serenity Lake, as provided in the Restrictive Covenants, that it would be better to build on the southeastern shore because otherwise, their home would be as close as ten feet to the home that was previously built on the southeastern edge of No Wake Lake. Moreover, the Hansons had previously built their dock on the eastern side of Serenity Lake and they wanted their home to be in close proximity to their dock.

Because of his desire to build a home on the southeastern corner of Serenity Lake, as opposed to the southwestern corner, Tom, in 1996, called a meeting of the owners of Lots 1 through 5. All owners originally gave their consent to Tom's proposal to build the Hanson's home on the southeastern corner of Serenity Lake. In fact, four of the landowners signed written amendments to the restrictive covenants to specify that Hansons could alter the location of their new home. Tom and Sue proceeded to build their home, as agreed by all the landowners, on the southern end of Serenity Lake.

The Hansons completed construction of their new home in 2002 and shortly thereafter filed a declaratory judgment action in state district court seeking to move the location of the sixth lot from the western side of Serenity Lake to the location of their newly built home. The Hansons' declaratory judgment action was opposed by the owners of Lot 5, Brian and Linda Heeney. In late 2003, the state district court entered summary judgment in favor of the Heeneys. The Supreme Court of Montana affirmed the state district court's summary judgment ruling, finding that the transfer of the lake use rights from the western portion of Serenity Lake to the southeastern side of Serenity Lake, as a property right, had to be in writing, or was otherwise unenforceable.

Interestingly, the parties agree that Debtors, as purchasers of all the Hansons rights and

interests, have the right to use Serenity Lake. Tom explained at the hearing that his sole purpose in filing the state court action was to seek a ruling that the Hansons were the sixth landowner, as identified in the Restrictive Covenants, and could thus use Serenity Lake during the 35 hours per week that is set aside for the exclusive use of the landowners.

Tom and Sue later sold to Debtors in July of 2004 their remaining interest in lots 8 and 12, excepting therefrom lots 1, 2, 3, 4 and 5 of WSME. At that time, Debtors acquired the aforementioned interest in lots 8 and 12 (consisting of roughly 27 acres) and the improvements thereon, which included the lake bed, the water in the lake, one domestic water right, two commercial water rights, a home, a dock, and a boat launch. It also appears that Debtors acquired the right to use the name Water Ski Mania.

Debtors originally agreed to pay Tom and Sue $695,000 for their interest in Lots 8 and 12. However, after Debtors learned of issues with the landowners of lots 1 through 5 of WSME relating to the Restrictive Covenants, the Hansons agreed to reduce the sales price to $645,000 and agreed to carry any amount that Debtors could not finance with a lending institution. Tom testified that he and Sue sold the property at a price below its appraised value because of the ongoing issues with the landowners of lots 1 through 5, particularly the Heeneys.

Debtors, like the Hansons, have encountered difficulty dealing with the landowners in virtually every facet of their relationship and it appears that the landowners, and in particular, the Heeneys, have undertaken a course of action that is severely impairing Debtors' ability to sell their real property. For instance, Section VI.g of the Restrictive Covenants provides that the "Landowners shall have first collectively and then individually the right of first refusal for the purchase of the lake property." Debtors entered into an agreement to sell their real property to Christopher Van Sys for the sum of $1.2 million in 2006. The landowners, rather than merely

stating whether they would match the offered price of $1.2 million, made demands upon Debtors for additional documentation that is not generally made available under a first right of refusal. Jim testified that the landowners treated their first right of refusal as a last right of approval that caused the potential buyer to leave. Similar to the Debtors' recent attempt to sell their property, Tom and Jim both testified that the landowners attempted to derail the sale between the Hansons and Debtors.

In addition to derailing sales, the Heeneys have made it clear to Debtors that they would frustrate Debtors' efforts to enforce the bylaws that are referenced in paragraph VI.i of the Restrictive Covenants. The landowners have also conducted unauthorized clinics and tournaments on Serenity Lake. The landowners, and particularly the Heeneys, have also invited guests to use Serenity Lake and have refused to pay the guest fee that is applicable under the bylaws. The Heeneys have also built a dock on Serenity Lake that Debtors claim creates a hazard and is not permitted.

Don Parsons of Napa, Idaho ("Don"), who is a member of the American Water Ski Association, the governing body of competition water skiing, testified that he is very familiar with Serenity Lake and had even contemplated buying the lake in 1999. Following the 1999 Western Regional Water Ski Championship, held by Water Ski Mania, Don forwarded earnest money to Tom. Don then visited with some of the landowners and came to the conclusion that the landowners would treat him as subordinate to them with respect to use of the lake and maintenance of the lake. Don was not aware of a similar situation anywhere in the United States. In fact, Don testified that customarily, homeowners, such as the Defendants in this case, pay substantial fees to use water ski lakes and are certainly not allowed to let guests use the lake without permission and without paying a fee.

The Court is deeply troubled by the facts in this case. However, the particular relief sought by Debtors' counsel at this juncture, namely a request that the Court extinguish the Restrictive Covenants, is simply not supported by applicable law. However, as will be discussed below, if the landowners continue to frustrate Debtors' use, maintenance and possible sale of their property, this Court will not preclude Debtors from seeking appropriate relief, including but not limited to, a claim for the breach of the covenant of good faith and fair dealing, a claim for breach of contract or a claim for the tortuous or intentional infliction of emotional distress or tortuous interference with business relations as discussed and applied by this Court in the context of a bankruptcy proceeding in *Miller v. Snavely (In re Miller),* 19 Mont. B.R. 300 (Bankr. D.Mont. 2002), *aff'd*, 2005 WL 281387 (9th Cir. 2005).

The evidence in this case overwhelmingly shows that the actions of the landowners have had an adverse financial impact upon the Debtors. As a consequence, Debtors sought relief under the bankruptcy code and filed this related adversary proceeding. According to the Final Pretrial Order filed by the parties, Debtors maintain in this proceeding that:

1. The Covenants, if valid, are dischargeable as an executory contract.

2. The Covenants are invalid because they do not meet the necessary requirements for a covenant.

3. The Covenants run only with Lots 1 - 5.

4. The use of the lake has been permissive and can be terminated by the lake owner.

5. The landowners abused any right or privilege they may have.

6. Various homeowners have intentionally interfered with the use of the lake and attempted sales so that they could put the Lake Owner into bankruptcy and purchase the property at a discount.

7. Members of the HOA have destroyed the commercial marketability of the property

by inviting the members of the owner's Ski Club to ski for free with them, thus prompting them to not renew their memberships.

8. The HOA has abused its guest privileges, if they ever had any.

9. The HOA members have illegally brought guests onto the lake.

10. Simmons is illegally using his property for a commercial body shop/auto repair.

11. The homeowners association and its members have abused the first right of refusal and used it to run off prospective buyers.

12. Jardon wanted a horse pen on Hanson's property in order to circumvent the covenants.

13. HOA's actions are morally unconscionable.

14. Even if the covenants are valid, they should be terminated for cause under the theory set forth in *Crimmins v. Gould, 149 Cal. App 2d 383, 391, 308 P.2d 786, 791 (1957); Selvia v. Reitmeyer, 156 Ind. App 203, 211, 295 NE2d 869, 874 (1973), Halsrud v. Brodale, 247 Iowa 273, 283, 72 NW2d 94, 100-101 (1955); Perry v. City of Gainesville, 267 SW2d 270-273 (Tex. Civ. App. 1954).*

15. Without the encumbrance the property is more valuable and more marketable, thereby insuring that all creditors get paid from the proceeds.

16. There was no consideration for the covenants.

17. If there were consideration, that consideration has failed.

18. If the covenants are valid, they are executory in that both parties still have obligations to be met under the agreement, *i.e.*, it is executory.

19. Water Ski Mania Estates should not be confused with the term "Water Ski Mania" which is often applied to Serenity Lake. They are two separate and different entities.

20. Lots 8 and 12 are not described in the Covenants.

21. The lake owner, owners of lot 8 and 12 have the exclusive control of the lake.

22. On at least two occasions prior to the Hayes purchasing the property, the Homeowner's Association and the homeowners individually were offered an opportunity to purchase the property and refused the offers.

23. The lake owner has done nearly all maintenance and repairs of the lake.

24. The homeowners have an obligation to get permission from the lake owner to use the lake at various times and they are obligated to provide insurance, releases of liability, etc.

25. The interpretation of covenants is done under the laws of contract. *Creveling v. Ingold, 331 Mont 322, 132 P.3d 531 (2006)[.]*

26. The Lakeowners previously asked for an assessment that was turned down by the HOA.

27. The HOA is not paying any taxes, costs, assessments, but instead, the Lakeowner has shouldered all the burden for taking care of the lake and making it useable.

28. Removal of the restrictive covenants will increase the properties value and saleability.

In contrast to the Debtors' position, the Defendants allege as follows:

1. Restrictive Covenants are valid. They are property rights which belong to the homeowners association and as such cannot be avoided in this bankruptcy proceeding. Consideration for this property right is a part of the purchase price of each parcel of property.

2 All of the Defendants deeds of ownership contain provisions referring to the Restrictive Covenants.

3. Use of the lake by the lot owners is a lifetime right. Restrictive Covenants Section VI.

4. To date, the landowners have never abused any rights or privileges guaranteed by their Restrictive Covenants.

5. The Montana State Supreme Court has ruled that these Restrictive Covenants in this case are property interest that belong to the landowners and run with the land. *Hanson v. Water Ski Mania Estates (2005).*

6. The highest state court in Indiana agrees with the Montana State Supreme Court that restrictive covenants such as in this case are property rights which cannot be avoided. The Bankruptcy Court in Indiana affirmed that state court decision and refused to avoid such covenants since they were property rights and not executory contracts. *Gouveia v. Tazbir* 37 F.3d 295, 299 (7th Cir. 1994).

7. At the time that each of the Defendant homeowners purchased their lake front property, upon payment of the purchase price there were no other obligations to be performed by any of those homeowners in order to enjoy a lifetime use of the lake. Since the homeowners did not have any further obligations to be performed during the time that the Hayes' bankruptcy petition was filed, the Restrictive Covenants cannot be deemed as executory contracts. *In re Robert Helms Construction and Development Co., v. Unsecured Creditors' Committee of Robert L. Helms Construction and Development Co.* 139 Fed.Rptr3d 702 (9th Cir.1998).

8. The avoidance of the Restrictive Covenants would significantly reduce the fair market-value of the lake front realty belonging to the member of Water Ski Mania Estates Homeowners Association. Thus, these members would become unsecured creditors in the Hayes Bankruptcy. The amounts owing by Hayes to unsecured creditors would exceed the maximum amounts allowed in a Chapter 13 proceeding resulting in the dismissal of this Chapter 13 proceeding. 11 U.S.C. §109(e).

9. None of the homeowners association member have abused or exercised the first right of refusal in order to prevent the sale of this property by either Hayes or his predecessor.

10. Homeowners association members have always complied with the covenants concerning the use of the lake.

11. Although not obligated to do so, members of the homeowners association have voluntarily assisted with maintenance and repairs of the lake.

12. The value of the lake water rights has been over stated by Mr. Schmidt by several hundred thousand dollars.

13. The value of the lake is worth far less than 1.2 million dollars.

14. Contrary to prior allegations by the Debtors, Brian Heeney, one of the homeowner Defendants, property extends to the lake water. His deed grants him the right to erect a dock on the lake.

15. If Debtors are permitted to avoid these covenants, and the property is sold as proposed by the Debtors, the Homeowners would lose their community septic system which is located on the property which is proposed to be sold. This action in turn would require all homeowners to install individual septic systems for each home or establish a new community system or petition the city to construct a city sewer system which would take a minimum of one year. Installing individual systems would be very difficult because of the high water table at one end of the system and recent septic regulations.

In this Court's opinion, the landowners' actions, and particularly the Heeneys', have, to

date, been unreasonable. However, irrespective of the landowners' actions, the Plaintiffs' primary assertion is that the restrictive covenants are an executory agreement that may be "extinguished." On the topic of executory contracts, the Ninth Circuit Court of Appeals explains:

> Whether a contract is executory within the meaning of the Bankruptcy Code is a question of federal law. *Benevides v. Alexander (In re Alexander),* 670 F.2d 885, 888 (9th Cir.1982). Although the Code does not define "executory contract," courts have generally defined such a contract as one on which performance is due to some extent on both sides. *NLRB v. Bildisco & Bildisco,* 465 U.S. 513, 522 n. 6, 104 S.Ct. 1188, 1194 n. 6, 79 L.Ed.2d 482 (1984). Also, in executory contracts the obligations of both parties are so far unperformed that the failure of either party to complete performance would constitute a material breach and thus excuse the performance of the other. *Pacific Express, Inc. v. Teknekron Infoswitch Corp. (In re Pacific Exp., Inc.),* 780 F.2d 1482, 1487 (9th Cir.1986). The question of the legal consequence of one party's failure to perform its remaining obligations under a contract and whether one of the parties' failure to perform its remaining obligations would give rise to a material breach is an issue of state contract law. *Hall v. Perry ( In re Cochise College Park, Inc.)* 703 F.2d 1339, 1348 n. 4 (9th Cir.1983).

*In re Wegner*, 839 F.2d 533, 536 (9th Cir. 1988). The Ninth Circuit Court of Appeals just recently explained that a "contract is executory, and therefore assumable under § 365, only if one party's failure to perform its obligation would excuse the other party's performance." *Zurich American Ins. Co. v. International Fibercom, Inc. (In re International Fibercom, Inc.*), ___ F.3d ___, 2007 WL 2610892 (9th Cir. Sept. 12, 2007).

     In the case *sub judice*, this Court does not believe that the Restrictive Covenants meet the definition of executory contract as discussed above, and as discussed in *Unsecured Creditors' Comm. of Robert L. Helms Constr. & Dev. Co. v. Southmark Corp. (In re Robert L. Helms Constr. & Dev. Co., Inc.)*, 139 F.3d 702 (9th Cir. 1998), and *In re Bergt*, 241 B.R. 17 (Bankr. D.Alaska 1999). Accordingly, Debtors' are not allowed to reject or breach the restrictive

13

covenants under 11 U.S.C. § 365.

However, it is nevertheless clear to this Court that the Restrictive Covenants are ambiguous and are being interpreted by the landowners in such a fashion that is unreasonably burdensome to Debtors. As the Court will discuss below, the Restrictive Covenants can be enforced by a court of equity, such as this Court, in such a manner that enables these Debtors to fashion a realistic plan of reorganization.

After considering the testimony, the Court finds that the landowners are interpreting their right of first refusal in an overly broad fashion. Under the Restrictive Covenants, the landowners have the right to buy Debtors' property by matching the price and terms of any acceptable bona fide offer. However, whether a particular offer satisfies the requirements of a title company is not a concern of the landowners. Furthermore, the landowners are not entitled to interview or interrogate a prospective buyer and they certainly have no right to see any business plan that the prospector buyer may have for the property.

Second, it is quite clear from a reading of the Restrictive Covenants that they are primarily intended to do two things; allow landowners nonbusiness use of Serenity Lake during certain hours of the week while at the same time protecting the lakeowners' right to conduct business on the Lake. The Court would note at this juncture that Serenity Lake is not part of the WSME. Rather, the Restrictive Covenants grant the landowners limited use of Serenity Lake. Specifically, the landowners are granted 70 hours of use of Serenity Lake per week. Additionally, each landowner is entitled to semi-exclusive use of Serenity Lake for two non-consecutive days during a calendar year for such events as private parties, class reunions, family gatherings or similar events. The delineated events are all private, as opposed to commercial,

and the use of Serenity Lake for such private events is clearly limited to two days per year per landowner.  A landowner's use of Serenity Lake–limited to the two particular uses delineated above–may be usurped by the lakeowner for commercial activities during the week and for four weekends during the year for water ski tournaments and/or clinics.

The landowners' delineated use of Serenity Lake is protected by a provision in the Restrictive Covenants that limits the lakeowners' use of the property for business and ski club purposes to 44 hours per week during the hours of 8:00 a.m. to 9:00 p.m.  The use of Serenity Lake by the landowners and the lakeowner is clearly drafted in such a fashion to protect the lakeowners' exclusive use of Serenity Lake for commercial purposes.  Any commercial use of Serenity Lake by the Defendants, including the sponsoring of water ski tournaments or clinics is expressly precluded.

As noted above, the Restrictive Covenants grant six landowners use of Serenity Lake a total of 70 hours per week, 35 of which are exclusively for the use of the landowners and the other 35 are shared with the lakeowner.  Tom drafted the Restrictive Covenants with the intent that he, as the lakeowner, would have the right to use Serenity Lake all but the 35 hours per week that was set aside for the exclusive use of the landowners.  Tom also drafted the Restrictive Covenants to identify a sixth landowner, who Tom believed would be himself.  The purpose of identifying the sixth landowner was to grant Tom use of Serenity Lake during the 35 hours that were set aside for the exclusive use of the landowners.  In other words, Tom wanted use of Serenity Lake 24 hours per day, seven days a week.

Although Tom identified the sixth landowner as having a single family dwelling on the west side of Serenity Lake, Tom later decided to move his residence to the southeast side of

Serenity Lake. The only landowner that opposed Tom's relocation of the six lot was Heeney. Heeney successfully precluded Tom from changing the location of the sixth lot from the west side of Serenity Lake to the east side, but on appeal, the Supreme Court of Montana in *Hanson v. Water Ski Mania Estates*, 326 Mont. 154, 158, 108 P.3d 481, 484, 2005 MT 47, ¶ 13, made a point of noting that the "Hansons . . . retained land on the west side of Serenity Lake and [if they] choose to build a single family dwelling there in accordance with WSME covenants, nothing in the District Court's Order of Summary Judgment precludes them from doing so."

Along these same lines, Tom and Jim testified that the bylaws set forth restrictions on the use of Serenity Lake by guests of the landowners. Jim also testified that the bylaws provide for a fee for use of Serenity Lake by guests. Defendants did not challenge the above testimony. Nevertheless, the testimony also establishes that the landowners, and in particular, the Heeneys, are inviting guests to use Serenity Lake in a fashion that is contrary to the bylaws and are failing to pay the fee that is required under the bylaws. Such action by the landowners is a breach of the covenants and, as will be discussed below, could result in a permanent termination of the landowners' rights to use Serenity Lake under the Restrictive Covenants.

In addition to using Serenity Lake for water skiing purposes, the record shows that the Heeneys have built a dock on Serenity Lake. Nowhere is the installation of a dock mentioned in the Heeney's Warranty Deed admitted into evidence as Exhibit O and the building of a dock is clearly not authorized by the Restrictive Covenants. The Restrictive Covenants specifically provide for a common dock in Section VI.d. Any agreement that the Heeneys may have had with the Hansons to install a portable dock at an agreed location may be null and void or did not survive the signing and recordation of the deed.

16

Debtors also assert that they have approached the landowners about imposing an assessment as permitted by Sections V and VI.h of the Restrictive Covenants and the landowners have flatly refused to agree to any assessment. As explained by the Supreme Court of the State of Montana in *Kennedy v. Dawson*, 296 Mont. 430, 440. 989 P.2d 390, 396-97, 1999 MT 265, ¶ 42 (Mont. 1999):

> "[E]very contract, regardless of type, contains an implied covenant of good faith and fair dealing." *Story v. City of Bozeman* (199, 242 Mont. 436, 450, 791 P.2d 767, 775. The Montana Legislature has set forth the standard of conduct required by the implied covenant of good faith and fair dealing: "honesty in fact and the observance of reasonable commercial standards of fair dealing in the trade." § 28-1-211, MCA. "Each party to a contract has a justified expectation that the other will act in a reasonable manner...." *Story,* 242 Mont. at 450, 791 P.2d at 775.

The landowners, in refusing to agree to any assessment, are failing to abide by the implied covenant of good faith and fair dealing. As Don Parsons testified, other persons similarly situated to the landowners in this case pay substantial fees to use such a lake as Serenity Lake and this Court finds it quite reasonable that the landowners in this case should pay their share of the insurance, taxes and repair and maintenance costs associated with keeping Serenity Lake and the surrounding grounds in a safe, well-maintained, working condition.

On this point, Section II recites that the "herein described property shall be used for single family dwelling purposes." Consistent with the above language pertaining to the 5 primary lot owners in WSME is the language in Section VI.f which defines the sixth lot owner as "the owner of a single family dwelling built on property immediately west of the lake." Tom testified that many of the original owners of Lots 2 through 5 owned their lots for numerous years before they built a home. The original purchasers of Lots 2 through 5 used Serenity Lake during the period of time when no homes were built on their lots. Debtors own the land immediately to the west of

17

Serenity Lake and it is not disputed that Debtors could conceivably build a home on the property they still own to the west of Serenity Lake. As a result, Debtors are the sixth owner identified in the Restrictive Covenants. The sixth lot has been identified as a single family dwelling lot and nothing in the Restrictive Covenants requires that a home be built before a landowner may enforce his or her rights under the Restrictive Covenants. Debtors, therefore, have the right to seek enforcement of each and every provision in the Restrictive Covenants. Moreover, the Court also ruled at the September 7, 2007, hearing that Debtors, as the lakeowners, have the right to enforce the Restrictive Covenants.

Thus, if the landowners do not want to cooperate with the Debtors, and thereby frustrate their ability to either formulate a confirmable Chapter 13 plan and/or sell their real property, this Court would expect the Debtors to come back to this Court for further enforcement of the Restrictive Covenants. A further Court proceeding, that is based upon evidence that is similar to the evidence now before the Court, could result in a finding by this Court that the landowners have violated the implied covenant of good faith and fair dealing and may pursue other remedies available at law or in equity. The landowners' continued refusal to agree to an assessment for the maintenance and operation of Serenity Lake could also potentially violate the maxim that a "person who receives the benefit shall bear the burden." *See* MONT. CODE ANN. § 1-3-212. Similarly, this Court would not be opposed to entertaining an action by Debtors against the landowners for a claim of tortuous or intentional infliction of emotional distress or tortuous interference with business relations. The damages this Court could assess against the landowners in such an action could be substantial, particularly in light of the fact that Debtors had an offer of $1.2 million on their property and given the testimony of Bill Bahny, the Broker/owner of ERA

Bill Bahny and Associates, who testified that under normal circumstances, he should be able to sell Debtors' property for $1.5 to $2 million.

The time is now for the landowners' persistent, vituperative and intemperate attacks on the Debtors to end and for the landowners to act in a reasonable manner. As set forth in the preamble of the Restrictive Covenants, "Do unto others, as you would have them do unto you." All commercial use and any unauthorized use of Serenity Lake by the landowners and/or their guests must come to an immediate halt. The use of Serenity Lake by the landowners for clinics and tournaments is expressly forbidden. Furthermore, the Heeneys need to immediately remove their dock from Serenity Lake. Perhaps if the Heeneys deal in a reasonable manner with Debtors, such as abiding by the Restrictive Covenants and bylaws, and by agreeing to a reasonable assessment, Debtors will reciprocate such reasonableness and allow the Heeneys to reinstall their dock in a safe location.

In accordance with this Memorandum of Decision and pursuant to this Court's oral ruling made September 7, 2007, as reflected in the minute entry entered that same date,

IT IS ORDERED that the Court will enter a separate Judgment in favor of the Defendants and against the Plaintiffs determining that:

1. The Restrictive Covenants at issue in this Proceeding are not an executory contract subject to rejection under 11 U.S.C. § 365;

2. The landowners' right of first refusal is not a right of last approval, and merely allows the landowners to match the price and terms of any acceptable bona fide offer.

3. Commercial use of Serenity Lake by the landowners and/or their guests is expressly forbidden.

    4. Any unauthorized use of Serenity Lake by the landowners and/or their guests is expressly forbidden.

    5. The use of Serenity Lake by the landowners for clinics and tournaments is expressly forbidden.

    6. The Defendants Brian and Linda Heeney shall remove their dock from Serenity Lake on or before March 1, 2008.

    7. Debtors are the sixth landowner identified in the Restrictive Covenants and as the sixth landowner and as the lakeowner, have the right to enforce the Restrictive Covenants.

                          BY THE COURT

                          */s/ Ralph B. Kirscher*
                          HON. RALPH B. KIRSCHER
                          U.S. Bankruptcy Judge
                          United States Bankruptcy Court
                          District of Montana